**BRUCE DRUG, INC. and Richard Najarian d/b/a Bruce Medical Supply, Plaintiffs, Appellees,**

v.

**HOLLISTER INCORPORATED, Defendant, Appellant.**

No. 81–1745.

United States Court of Appeals, First Circuit.

Argued Feb. 12, 1982.

Decided Sept. 8, 1982.

Donald B. Gould, with whom Andrew S. Hogeland, Goodwin, Procter & Hoar, Boston, Mass., Roger J. McFadden and Hubachek & Kelly, Ltd., Chicago, Ill., were on brief, for defendant, appellant.

Gerald P. Tishler, with whom Barbara A. Lenk, and Brown, Rudnick, Freed & Gesmer, Boston, Mass., were on brief, for plaintiffs, appellees.

Before ALDRICH and CAMPBELL, Circuit Judges, TORRUELLA,* District Judge.

BAILEY ALDRICH, Senior Circuit Judge.

This is an appeal by a manufacturer from a preliminary injunction ordering it to continue supplying its products to plaintiff dealers. Plaintiffs, Bruce Drug, Inc. and Richard Najarian, d/b/a Bruce Medical Supply, sue, *inter alia*, under the Clayton Act, 15 U.S.C. § 26, alleging violation of section 1 of the Sherman Act, 15 U.S.C. § 1, by the termination of their dealerships, and by further actions resulting in

* Of the District of Puerto Rico, sitting by designation.

their being boycotted by other dealers from whom they had been acquiring defendant's products. The matter was submitted on the basis of exhibits, affidavits and depositions. We reverse, finding unwarranted the court's finding with respect to the likelihood of plaintiffs' success. In so doing we recognize that the scope of our review is no broader because the evidence was written, *e.g., Custom Paper Products Co. v. Atlantic Paper Box Co.*, 1 Cir., 1972, 469 F.2d 178, 179; nor do we distinguish between the respect due to ultimate and to subsidiary findings. *Pullman-Standard v. Swint*, —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). At the same time, the fact that the evidence was in writing accentuates the district court's obligation to consider all of it, and the court's findings can stand only if they are reasonably supported on the record as a whole. *Custom Paper Products Co. v. Atlantic Paper Box Co.*, ante.

We have a serious problem with the number of unchallenged records which have been ignored, and the inconvenient affidavits that plaintiffs would dismiss as "obviously false," and as indicative of "the frightening degree to which the dealers were and are intimidated." Certain affidavits have been disregarded not only without giving reasons, but without apparent grounds. And while plaintiffs are quick to reject defendant's affidavits, they emphasize the importance of one given them by a discharged employee (Mayer) of defendant which, in part, is plainly hearsay, and is contradicted not only by several witnesses, but by unimpeached records. Our difficulties do not stop there. Both sides give varying interpretations, or advance different conclusions, about the same event, depending upon the point at issue. Thus defendant asserts at one stage that a letter written on January 23 could not have affected its decision to terminate plaintiffs' dealership because its decision was made January 25, assertedly before the letter could have arrived, and at another stage says that it was plaintiffs' conduct that led to the decision to terminate, said conduct having culminated at a meeting concededly taking place on January 28. Plaintiffs, correspondingly, combat each of these issues by arguing the obverse, as occasion demands. Perhaps under these circumstances we should let the chips lie where they fall, but duty demands a resolution on the record.

Defendant Hollister Incorporated is the nation's leading manufacturer and supplier of ostomy appliances and related products for ostomates, viz., pouches, etc., used for the collection of body wastes which drain through a surgically created opening in the abdomen of individuals whose intestinal or urinary tracts have been fully or partly removed by surgery. Although prescriptions are not needed, it is essential that ostomates be properly fitted to avoid physical injury, and highly desirable that salespersons be tactful and understanding, and have appropriate training. From defendant's standpoint, this is most important at the outset, it appearing that customers, once satisfied, have "strong brand loyalty."

Defendant distributes its products domestically through a network of trained, authorized dealers composed of retail drug stores, pharmacies and other surgical supply stores now totalling approximately 1,600 in number. Pursuant to a contract, Abbott Laboratories, Inc. (Abbott International) has the sole right to distribute Hollister products abroad. Bruce Drug, a retail pharmacy in Waltham, Massachusetts, became an authorized Hollister dealer in 1971. In January, 1978, Richard Najarian, president of Bruce Drug, wrote Hollister and, alluding to previously discussed plans to market Hollister products on a national basis, requested permission to change its account name to Bruce Medical Supply. Hollister responded that it had no objections to the change. Najarian proceeded to set up, under the new name, a national mail order business in ostomy supplies. For a while Bruce Drug and Bruce Medical Supply operated under the same corporate structure and from the same location. In January, 1979, however, Bruce Medical Supply became a separate entity, operating as a sole proprietorship, and in November, 1979, it moved to a warehouse at a different location, leaving Bruce

Drug as an authorized Hollister retailer. For future purposes we sometimes refer to the plaintiffs jointly as Bruce.

By this time, through extensive advertising, Bruce Medical Supply had developed a substantial nationwide mail order business, selling ostomy products, both wholesale and retail, at discounts. Its Hollister retail prices, exclusive of shipping and handling charges, were 20% below suggested list. In addition to obtaining natural economies of scale, Bruce was able to place large enough orders with Hollister to qualify for standard quantity discounts. Its business swelled to approximately 10,000 individual customers in the United States and Canada. The court found that approximately 50% of its revenues were derived directly from the sale of Hollister ostomy products. Another 17% of its business came from the sale of non-Hollister, but related, products, most of which were sold to Hollister products users.

On February 1, 1980, Hollister notified Bruce by letter that it was terminating its dealership as of March 1. The court found that, rather than for the reasons given,

> "Hollister acted in response to the concerns of other authorized Hollister retailers over the potential loss of business to Bruce Medical Supply. At least one American authorized retailer communicated with Hollister in January, 1980 and suggested that Hollister should 'delay' shipments to Bruce Medical Supply as a way of forcing consumers to purchase from authorized retailers. See Plaintiffs' Exhibit 7. In addition, Abbott International ('Abbott'), the exclusive authorized overseas distributor of Hollister ostomy appliances, expressed concern to Hollister in January, 1980 about the discount pricing by Bruce Medical Supply that appeared in advertisements in the Ostomy Quarterly, an international publication for ostomates. See Plaintiffs' Exhibit 16. See also Plaintiffs' Exhibit 6 (complaint

from authorized retailer to Hollister in February, 1979 concerning loss of business to Bruce Medical). The nature of these communications and their timing are circumstantial evidence supporting my finding that *Hollister acted primarily because of the discount pricing by Bruce Medical Supply and because of the effect* that Bruce Medical Supply was having *on sales by authorized Hollister retailers.*" [1] (Emphasis ours.)

Having in mind that there were 1,600 dealers, the amount of affirmative support for this general conclusion was miniscule. Although the court spoke of "at least one American authorized retailer ... in January, 1980," there is nothing to warrant the implication in the phrase "at least." The single retailer was a pharmacy in Miami. Its complaint was not about "discount pricing," but only about selling to unauthorized dealers. The previous complainer, a pharmacy in Tacoma, Washington, did make a telephone call a year before about pricing. The third complainer, Abbott, complained only because Bruce was publicizing its discount prices in an area where the court found, properly, see post, that Abbott had exclusive rights.[2] Against this insignificant showing substantial evidence was furnished by defendant that discount pricing of its products was generally recognized and accepted. Even plaintiffs' brief acknowledges that there were other discounters. To this we add that there is no evidence of any action taken or threatened against them, then, or at any time. Bruce itself, prior to the present imbroglio, had been discounting most certainly to defendant's knowledge, as its standard practice, for some two years. While Najarian testified that defendant's officials expressed objections, the inescapable facts are that defendant took no action, and did not even discontinue the quantity discounts that permitted Bruce's procedure. On this record we must find clearly erroneous the court's finding a

---

1. Elsewhere the court put it more simply. Some of the "justification [given] for Hollister's conduct obscures the true price-fixing motives of Hollister's conduct."

2. It is true that Abbott's letter contained gratuitous comments about the harm that plaintiffs' discounting must do to defendant's domestic business, but if true, this was not news to defendant, nor of Abbott's concern.

substantial likelihood that, in its February termination, "Hollister acted primarily because of (Bruce's) discount pricing," and particularly so its finding that the termination was the result of a conspiracy or combination, as distinguished from unilateral action by defendant.

Defendant's given reasons were Najarian's refusal to comply with certain credit requests, and his persistently belligerent attitude. The court found both to be pretexts. Although a sudden increase in plaintiffs' orders in January, 1980, might have suggested credit problems, there was evidence from which the court might find this reason was advanced as a talking point.[3] However, the belligerency was well proven, indeed, even admitted in plaintiffs' brief, with the inadequate excuse that it was brought on by defendant's poor performance. Even if defendant's performance had, in fact, been poor, it would probably not have made Najarian's conduct any more palatable. It is similarly no answer to the well-documented, and longstanding, disputes between Najarian and defendant's territorial manager, culminating in written complaints by the latter to her superiors, for plaintiffs to assert that she was "obnoxious," and primarily at fault. Finally, plaintiffs scarcely help their case by producing an affidavit stating that in a pre-termination meeting with Najarian, Winn, defendant's president, who made the decision to terminate, became so irritated that he got "red in the neck and face . . . and screamed . . . to get Najarian out of his office." On plaintiffs' own evidence, defendant's claim that the termination was partly the product of a perceived personality problem is not easily dismissed. The

court, however, dismissed it without explanation.[4]

As a further difficulty with the court's conclusion that it was dealer complaints that caused defendant to terminate Bruce, we note the court's reasons for rejecting defendant's claim that the injunction would cause a reduction of services by local dealers, because of their cost, in the face of Bruce competition. The court found this "unlikely to occur because no individual dealer has been shown to be losing customers to Bruce Medical Supply in substantial numbers." This was, seemingly, riding the same horse in two different directions. The dealers were conspiring, although individually, they were suffering very little.

Interestingly enough, the court never names, or even, as we read its opinion, suggests, who were the conspirators involved in the termination of Bruce's dealership. Was it the gang of four; defendant and three complainers? While the court finds that the individual dealers involved therein were the boycott conspirators, all that it says with respect to the termination was that defendant "acted in response to the concerns of other authorized retailers over the potential loss of business to Bruce Medical Supply." This finding, even were it correct, did not make out a case. The mere existence of a number of complaints in a supplier's files, especially when a small number, is insufficient, without more, to sustain the inference that a dealer was terminated because of them, or because of a conspiracy. *H. L. Moore Drug Exchange v. Eli Lilly & Co.*, 2 Cir., 1981, 662 F.2d 935, 951; *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 3 Cir., 1980, 637 F.2d 105,

---

**3.** At the same time, we note that in rejecting it the court failed to weigh it in the light of defendant's conduct for the year following termination, when credit problems were eliminated but defendant did not interfere with Bruce's access to its products except when directly traced to foreign sales. *See post.*

**4.** We cannot forbear commenting upon a matter, noted by the court, that after suit was brought, defendant's president, Winn, furnished an affidavit giving further reasons, alleging every sort of poor performance by

Bruce in the conduct of its dealership. The court, warrantably, found these charges to be false. We do not see how it could have found otherwise. If half of these charges had been true, Bruce should have been out of business by itself, long before defendant's termination, or if still functioning, defendant clearly would have advanced these reasons at the time. Perhaps, in justice, defendant should lose the case because it devised false reasons for the injunction hearing, but an antitrust case cannot be so created.

110–17, *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300.

> "Even where a termination follows a receipt of complaints from wholesalers or agents, there is no basis for inferring the existence of concerted action, absent some other evidence of a tacit understanding or agreement with them."

*H. L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d ante, at 941.

> "There are special reasons for applying the precept to a case in which a manufacturer receives price cutting complaints from competitors of a particular customer. To permit the inference of a concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of its independent business judgment and emasculate the terms of the statute."

*Texaco, Inc.*, 637 F.2d, ante, at 111 n.2. Plaintiff's solitary authority to the contrary is *Battle v. Lubrizol Corp.*, 8 Cir., 1982, 673 F.2d 984. With respect, the majority opinion there purports to recognize the rule and then, without explanation, reaches the opposite result. The facts, moreover, were quite different; a small customer being cut off on the complaint of a powerful one. In any event, we decline to hold this generally recognized rule can be overcome by complaints from two pharmacies, a year apart, and a foreign dealer not in competition, whose complaint was limited to advertisements.

Finally, an affirmative finding of conspiracy is not to be supported simply by labelling a given reason pretextual. *Eli Lilly & Co.*, 662 F.2d, ante, at 941; *cf. NLRB v. Eastern Smelting & Refining Corp.*, 1 Cir., 1979, 598 F.2d 666. As the court said in *Eli Lilly & Co., ibid.*,

> "[T]he mere fact that a business reason advanced by a defendant for its cut-off by a customer is undermined does not, by itself, justify the inference that the conduct was therefore the result of a conspiracy."

We have already pointed out that the court's labelling the continued belligerency of Najarian pretextual was clearly erroneous. With regard to defendant's credit complaints, as to which the court chose to accept plaintiffs' rather than defendant's evidence, but *see* post, we note this further language from *Lilly*,

> "Even if a manufacturer or supplier, acting independently, gave a false or inaccurate reason for its action, whether because of a desire to avoid controversy or some other consideration, this would not violate any legal obligation to the customer, absent proof of a conspiracy or breach of contract."

Put another way, it takes two to tango, and even a truly pretextual reason advanced by one party is not, without more, evidence binding the other alleged parties to prove an agreement. No finding of conspiracy was warranted on this record.

*The Boycott, so-called*

Perhaps realizing the paucity of the evidence supporting its finding of a concerted termination of Bruce's dealership, the court conceived a nunc pro tunc approach based upon a subsequent enforced prevention of Bruce's purchasing defendant's goods from other dealers. After it had been cut off from direct purchases, Bruce negotiated with other dealers, persuading them to include in their orders large quantities desired by it. This would usually benefit the intermediary, as it could thereby increase its total order to obtain quantity discounts, which it would share with Bruce. The court found,

> "During the spring of 1981, Hollister took steps to prevent Bruce Medical Supply from continuing to purchase Hollister ostomy products. Hollister systematically held shipments of large orders by retailers while it investigated whether Bruce Medical Supply was the ultimate purchaser of the products. Before releasing such an order, Hollister explained to the retailer that Bruce Medical Supply was diverting products abroad in contravention of Hollister's marketing policy and that retailers, therefore, should not continue selling to Bruce Medical Supply. If the retailer refused to cooperate, it

directly or indirectly threatened to terminate the retail authorization agreement. [Citation omitted.] As a result of Hollister's actions, only six retailers remain willing to sell to Bruce Medical Supply."

A lot of water, however, had flowed over the dam between the March, 1980 termination, and March, 1981, of some of which the court failed to take note. Bruce began purchasing from other dealers immediately upon termination. Indeed, by a Najarian affidavit, the substance of which the court accepted as a basis for granting the injunction, Bruce could not remain in business for a week if it lacked Hollister products. It is inconceivable that defendant, both from Bruce's continued advertising, and with even a rudimentary business awareness, did not know that Bruce, who carried 10,000 customers, was acquiring suppliers elsewhere. At the same time, Bruce's indirect purchasing relieved defendant of any credit problems, and of dealing with Bruce's belligerent president. To say, on this record, that a general boycott a year later was part and parcel of an undertaking to prevent price discounting seems a very considerable jump.[5] Particularly is it so in light of undisputed evidence of a quite different set of events occurring after the termination.

Pursuant to a contract, Abbott International for several years had had the sole right to distribute Hollister products abroad. For several years Hollister had sought to prevent domestic retailers from "diverting" goods overseas. This required policing. As early as 1978 Hollister executives including one Ploussard, had summoned the president of a Massachusetts retailer to Chicago and requested that he cease exporting Hollister products. Policing was facilitated by the fact that foreign ostomates, for reasons not altogether clear, tend to use a much higher rate of closed, as distinguished from drainable, pouches than

do their American counterparts. Although the court made no findings on the subject, affidavits and undisputed contemporaneous records prove that employees of Hollister's International Marketing Division scanned the product mix of unusually large retail orders and contacted retailers placing suspect orders—generally orders for relatively large quantities of closed pouches. Such orders were filled only upon the retailer's giving assurance that the goods were to be sold domestically.

In July, 1980, in the course of such monitoring, Ploussard, head of the International Marketing Division, called a Massachusetts retailer and inquired whether a large, suspect order was for foreign sale. The retailer volunteered that the order had been placed on Bruce's account. Ploussard told the retailer Bruce was suspected of selling abroad, and, after conferring with defendant's president, procured the retailer's agreement to drop that part of his order that was for Bruce. Thus commenced, although, as the court found, there was no substantial action until the following March, the so-called boycott. Coincidentally, or not, plaintiffs' brief concedes that July was "about the time that Bruce started to wholesale Hollister products to Germany."

Numerous exhibits of notes taken by Ploussard and his assistant Conley, also, significantly, an executive of the International Marketing Division, show that they called many other retailers during the summer of 1980 and afterwards, and inquired about the destination of unusual orders. The court found that retailers who informed them that the orders were for Bruce were told

"that Bruce Medical Supply was diverting products abroad in contravention of Hollister's Marketing policy and that retail-

---

5. Plaintiffs' brief, recognizing this problem, says it was "put ... to rest" by Mayer's affidavit that "within a week or so after the January 28, 1980 Chicago conferences, I learned that a system was set up to prevent Najarian from buying Hollister products from other dealers...." Mayer was an employee who said he had been discharged "without explanation."

The affidavit was rank hearsay, and was supported by nothing. Understandably, it was not adopted by the court. We would add that the system was singularly delayed, if this was its purpose, especially in the case of a supplier who could "frighteningly intimidate" its dealers.

ers, therefore, should not continue selling to Bruce Medical Supply. If the retailer refused to co-operate, Hollister directly or indirectly threatened to terminate the retail authorization agreement."

The orders of those who could assure that products were not going abroad were filled. For example, Ploussard's notes of a conversation with a New York retailer in September, 1980 read "not for overseas—expanded territory earlier in year—small hospitals, nursing homes—looks good—hope to double again—OK—order released." Another exhibit, introduced by plaintiffs, is a page of a March, 1981 Hollister computer printout of purchase orders. Next to a retailer's order for an unusually large number of closed appliances—the sort preferred by foreign ostomates—is the notation in Conley's handwriting, "Diversion to Bruce and thence to Europe?" Conley's accompanying notes and his testimony, corroborated by the retailer's affidavit, indicate that he called the retailer, informed him of the problem of international diversion, and procured his agreement to cease selling to Bruce. Yet another exhibit lists a retailer's substantial orders for closed bags with Conley's notation "put on credit hold? Yes. All orders match up to Bruce's International price list on bags except has no 314X." In addition, the record includes an extensive newsletter sent by defendant to its retailers in September, 1980, not mentioning Bruce, and setting forth a firm policy against permitting international sales.

In sum, plaintiffs' claim that defendant's professed concern with international diversion was merely a pretext to incommode Bruce generally is made out of whole cloth. Rather, the record conclusively establishes that defendant's action was due to a deep concern with foreign sales by domestic retailers;[6] that it was its policy not knowingly to fill orders which were going overseas; that it strongly suspected Bruce of engaging in foreign sales; and that when it asked retailers not to sell to Bruce this was its given reason.[7] Furthermore, plaintiffs freely admit they were in fact doing precisely what defendant was seeking to stop.

We can agree with the court that the action which defendant took, with at times unwilling cooperation of the dealers, to prevent Bruce from obtaining it goods, was, technically, concerted activity within the definition of the Sherman Act. *E.g., United States v. Parke, Davis & Co.,* 1960, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505. However, it was not shown to be for price discounting, but because of Bruce's wrongful interference with Abbott's valid exclusive contract. The court found policing to that extent to be reasonable. Plaintiffs have not appealed the ruling that Hollister "offered legitimate non-price-fixing motives for controlling the distribution of Hollister ostomy products abroad. Hollister has an obvious interest in protecting its good will by controlling the distribution of its products in foreign markets in a manner that allows the defendant to respond to language differences, variations of medical practice, and differences in government regulations. Hollister's ability to react effectively to such considerations not only affects its good will, but also its potential exposure to product lia-

---

**6.** We dismiss as clearly erroneous the court's finding that defendant "organized the boycott at the urging of Bruce Medical Supply's horizontal competitors," as there was, literally, no evidence to support it. The only support the court gave for this finding was a letter from an Indiana drug store, complaining that Bruce was its main competitor. The letter was not written until April 27, 1981, long after the "boycott" had commenced—indeed, after plaintiffs had brought suit to restrain it.

**7.** It is true that in an affidavit dated May 27, 1981, defendant's president Winn stated that he took action to interfere with Bruce's purchases "in order to give effect to Hollister's termination of Bruce Drug and in order to avoid the potential problems created by Bruce Supply's international diversion." However, even apart from the inadequate showing that the termination was for an unlawful reason, it is clear, as a matter of timing, that it was Bruce's international selling that was defendant's activating motivation. *Cf. NLRB v. Eastern Smelting & Refining Corp.,* 598 F.2d, ante, at 671. Indeed, as previously pointed out, it was not until partial efforts did not stop Bruce's international trading that defendant attempted a general shutoff.

bility. Furthermore, in coordinating long-range distribution and manufacturing strategies, Hollister has a legitimate interest in being free to service customers from separate markets with products that are manufactured in separate facilities. Hollister's ability to conduct business in accordance with these many interests has the overall effect of promoting vigorous interbrand competition. Since plaintiffs have not proved that Hollister dominates the foreign market, I am unable to find that Hollister's conduct diminishes intrabrand competition without producing significant benefits for interbrand competition."

We hold that from the court's unappealed ruling that defendant could reasonably attempt to prevent plaintiffs from selling its goods overseas, it follows that the post-termination "boycott," instituted to achieve that goal, was a reasonable restraint of trade.[8]

Bruce contends, very possibly correctly, that by March, 1981, defendant was undertaking to prevent its getting any Hollister products whatever, and asserts this to be an overbroad response. There are two answers to this. One is that Bruce does not suggest how defendant could safely protect itself by doing anything less. While foreign ostomates generally prefer closed pouches, we find nothing in the record to suggest that they use nothing else. It would appear that virtually any box of Hollister products sent to Bruce could, potentially, wind up overseas. Even if not, defendant was not required to adopt the least restrictive means of stopping Bruce from selling abroad, but merely means reasonably suited to that purpose. *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 3 Cir., 1975, 521 F.2d 1230, 1248–50; see *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 1977, 433 U.S. 36, 58 n.29, 97 S.Ct. 2549, 2561 n.29, 53 L.Ed.2d 568. Defendant cannot be faulted for failing to engage in elaborate and possible time-consuming speculation about Bruce's marketing intentions on an order-

by-order or box-by-box basis. The court having held, quite properly, that defendant was to be held to nothing stricter than a rule of reason, *Continental T. V., Inc. v. GTE Sylvania, Inc.*, ante; *Eastern Scientific Co. v. Wild Heerbrugg Instruments, Inc.*, 1 Cir., 1978, 572 F.2d 883, *cert. denied*, 439 U.S. 833, 99 S.Ct. 112, 58 L.Ed.2d 128, we see no basis for finding that it violated that standard.

Secondly, or, rather, perhaps, primarily, there would seem a shorter answer. Since it was Bruce's conceded selling abroad that brought on the boycott, and defendant had the right to control foreign sales, all Bruce had to do was to agree to stop its interfering, and adhere to the agreement, and then complain if defendant continued the boycott. Poachers should be in a poor position to cry foul.

Finding the court's conclusion as to likelihood of plaintiffs' success to be clearly erroneous, we need go no further. We vacate the injunction, and remand for further proceedings.

TORRUELLA, District Judge, dissenting.

With all due respect to the opinion of the majority, I dissent.

In determining whether a preliminary injunction should issue, the district court must measure the evidence against the following standards, namely: (1) Whether plaintiff will suffer irreparable injury if the injunction is not granted; (2) Whether such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) Whether plaintiff exhibits a likelihood of success on the merits; and (4) Whether the public interest will be adversely affected by the granting of the injunction. *Garcia v. Barcelo*, 671 F.2d 1 (1st Cir., 1982). The application of these criteria to the facts of a particular case is within the sound discretion of the trial court. He who seeks to overturn such a ruling has a "heavy burden." *Engine Specialties, Inc. v. Bombardier Ltd.*, 454 F.2d 527, 530 (1st Cir. 1972). A decision to issue a prelimi-

---

8. Nothing we say herein is meant to foreclose plaintiffs from attacking the exclusive contract as an unreasonable restraint of trade at the full

hearing on the merits. As the court held, however, they have shown no likelihood of succeeding in doing so.

nary injunction should not be disturbed in the absence of a *clear* showing of abuse of discretion or error of law. *Grimard v. Carlston,* 567 F.2d 1171, 1173 (1st Cir., 1978). The fact that the appellate court might have reached a conclusion contrary to that of the district court does not automatically warrant reversal unless such a conclusion is brought about by applying the aforementioned standard. *Celebrity, Inc. v. Trina, Inc.,* 264 F.2d 956 (1st Cir. 1959). Stated differently, mere disagreement with the conclusions of the district court is not sufficient for a reversal unless the appellate court finds that the court below is *clearly* erroneous. *Aberdeen & Rockfish R. Co. v. Students Challenging Regulatory Agency Procedures,* 409 U.S. 1207, 93 S.Ct. 1, 34 L.Ed.2d 21 (1972). The clearly erroneous standard is applicable even where, as here, findings are based on documentary evidence or undisputed facts. *Nemeroff v. Abelson,* 620 F.2d 339 (2nd Cir. 1980); *Custom Paper Products Co. v. Atlantic Paper Box Co.,* 469 F.2d 178, 179 (1st Cir. 1972); *Semmes Motors, Inc. v. Ford Motors Company,* 429 F.2d 1197, 1205 (2d Cir., 1970).

Although the majority opinion uses "clearly erroneous" language, it does not appear to me that this standard has been applied but rather one bordering on de novo review. See *Developments in the Law-Injunctions,* 78 Harv.L.Rev. 994, 1070–1073 (1965). It cannot be otherwise, as on the record of this case it is difficult to say that one "is left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

Before reaching its conclusions, the court below reviewed voluminous documentary evidence as well as various affidavits and depositions. Based upon the *totality* of this evidence, the district court issued a comprehensive opinion in which it found that plaintiff-appellees were dealers who were terminated by defendant-appellants for price-related reasons at the request of its horizontal competition. It found that as part of this conspiracy, a boycott was organized and enforced by defendant-appellant. The court then concluded that plaintiff-appellee's principal business would fail

unless defendant-appellant was enjoined from refusing to sell to plaintiff-appellee.

As I read the majority opinion, it does not question the existence of evidence on the record supportive of those findings, but rather attacks its weight. This, of course, is not the function of the appeals court in an interlocutory appeal under 28 U.S.C. 1292(a):

"This limited review is necessitated because the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at the final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief. Weighing these considerations is the responsibility of the district judge; only a·clear abuse of his discretion will justify appellate reversal."

*U.S. Steel Corp. v. Fraternal Ass'n. of Steelhaulers,* 431 F.2d 1046, 1048 (3rd Cir., 1970).

The majority's holding to the effect that plaintiff-appellants have failed to demonstrate a substantial likelihood of success on the merits overlooks the fact of business life that conspiracies to restrain trade are not usually brought to light by direct evidence or frank admissions, nor does the law require that quality of proof. *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.,* 633 F.2d 477 (7th Cir., 1980). Such actions are not normally the result of express agreement nor within the knowledge of non-participators. They are rather the machinations of those who surreptitiously seek to avoid the detection of their deeds. Proof of such acts is therefore mostly circumstantial in nature, requiring judicious application of those inferences which arise from the conduct under scrutiny. *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998, reh. den. 390 U.S. 1018, 88 S.Ct. 1258, 20 L.Ed.2d 169 (1968); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 47, 80 S.Ct. 503, 513, 4 L.Ed.2d 505 (1960). In reaching its conclusions, the court below took such matters into account. The majority's disconcertion with the conflicting evidence is understandable and tempts it to consider

"let[ting] the chips lie where they fall" (see slip opinion, page 3). This, I believe, is what should be done. It is the duty of the trial court, and not the appeals court, to sift through those conflicts and come up with the facts. Nor should we blithely dismiss the affidavit of defendant-appellant's president, Winn, with its false allegations (see footnote 4 of the majority opinion), in which he gives patently pretextual reasons for the severing of Bruce's dealership. It is precisely that type of conduct, among others, which allowed the trial judge to conclude that the true reasons for Hollister's actions were different from the stated ones. *Cf. United States v. Smith*, 680 F.2d 255, at 260 (1st Cir., 1982).

Although at this preliminary stage plaintiff-appellee's case is not exactly a powerhouse, there is adequate evidence on the record to sustain the district court's decision.