**Jean MOFFAT, d/b/a Beacon Hill Interiors**

v.

**The LANE COMPANY, INC. and James Dunlap.**

**Civ. A. No. 82–1667–Z.**

United States District Court, D. Massachusetts.

June 13, 1984.

John C. Wyman, Susan J. Baronoff, Roche, Carens & DeGiacomo, Boston, Mass., for plaintiff.

John J. Curtin, Jr., Zachary R. Karol, William G. Southard, Bingham, Dana & Gould, Boston, Mass., for defendants.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

This antitrust action is brought by Jean Moffat, doing business as Beacon Hill Interiors, against the Lane Company, Inc. ("Lane"), and James Dunlap ("Dunlap") the New England area sales representative for Lane's Hickory Chair Company division ("Hickory"), manufacturers of eighteenth century furniture reproductions. Count I of the amended complaint alleges a conspiracy in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 by Lane, Dunlap, and Boston area retail furniture dealers, competitors of plaintiff,[1] in furtherance of which Lane (through Dunlap) refused to sell to plaintiff directly, and (through other employees of Hickory) enforced a policy prohibiting authorized dealers of its furniture from selling to unauthorized dealers such as plaintiff. Counts II and III raise pendent claims for violation of Mass.Gen. Laws ch. 93A, § 11, and intentional interference with advantageous relations. Lane and Dunlap have moved for summary judgment on all counts.[2]

For purposes of this motion, the parties have agreed to the following relevant facts. Since 1979 Mrs. Moffat, in her business as Beacon Hill Interiors, has been principally engaged in the retail sale of home and office furniture. She sells mostly reproductions of eighteenth century furniture

and has carried lines from several manufacturers besides Hickory. She operates her business from her family's apartment on the fourth floor of 34½ Beacon Street, Boston, Massachusetts, where she sees customers by appointment only. Most frequently she deals with customers (the majority of whom are not Massachusetts residents) by mail or telephone, however.

In 1980, Mrs. Moffat began advertising in *Colonial Homes* magazine, indicating that she sold lines, including Hickory, at discount. A Hickory sales representative showed Dunlap her advertisement in the September-October 1980 issue, which offered "consistent savings of twenty-five percent" on lines including Hickory. Dunlap called Jerry Hux ("Hux"), then a Hickory field sales manager, mentioned the advertisements, and asked Hux about the plaintiff. Hux had not heard of her.

In January 1981, Dunlap called plaintiff, asked for and received a copy of her promotional brochure. By early 1981 he had learned that plaintiff bought her Hickory furniture from Tickle Furniture Company in North Carolina. He told Hux this and inquired about the volume of Tickle's purchases, which was small.

During the first half of 1981, at least five dealers separately called plaintiff's advertisements or literature to Dunlap's attention and asked about the plaintiff. However, no dealer reported losing a sale. In the spring of 1981, Dunlap called the plaintiff, asked for and was sent an invoice quoting a price on a particular Hickory sofa. He remembers asking about fabrics and being told he could go to any store to look at them. He then called Kaplan and

---

1. Two of those dealers, Kaplan and Fox, Inc. ("Kaplan") and Stuart Swan Furniture Company, Inc. ("Swan"), were originally named as defendants in this action, but are no longer parties.

2. Defendants have moved to strike the affidavit of John C. Wyman, submitted with plaintiff's opposition to the motion for summary judgment, on the ground that it attempts to introduce documents which would be inadmissible at trial, in violation of Fed.R.Civ.P. 56(e). Their objections to exhibits D, E, F and G are sus-

tained on the grounds of hearsay with respect to D, E and G, and of relevance with respect to F. Given the extensive stipulation of facts entered by the parties for purposes of this summary judgment motion, the utility of the remaining documents is not readily apparent. Exhibits A, H and I are, however, sufficiently relevant to be admissible. Exhibit B is admissible only to show Mr. Swan's attitude toward plaintiff. Exhibit C is admissible only as evidence that a suit was filed against Lane by Herndon House.

another dealer and told them that plaintiff might be using their showrooms to their disadvantage.

Throughout 1981, Mrs. Moffat had requested that Hickory supply her with numerous copies of its furniture catalog. By the summer of 1981, plaintiff was informed in writing that she had received the maximum number of catalogs that Hickory would supply to a consumer and further requests for catalogs received from the plaintiff were refused. Hux was aware of the situation. During the summer of 1981, Hux spoke to the Hickory representative for North Carolina about the extent of Tickle's purchases of Hickory furniture. In that summer, plaintiff stopped placing orders with Tickle and began buying Hickory furniture from Harvest House, a Hickory dealer in Denton, North Carolina.

In July 1981, a principal of the Golden Phoenix, a Hickory retail dealer in South Hadley, Massachusetts, called a Hickory customer service representative "to see how she [plaintiff] was selling furniture at such great discounts" of 40%. He asked about plaintiff's source of supply and the terms upon which she received it. The customer service representative said she would look into the matter. She wrote a memo about the call, mentioning plaintiff's discounting, which Hux saw. Hux replied that the plaintiff's source was Tickle Furniture.

During July 1981, when Dunlap made a sales call on the Golden Phoenix, one of its principals showed him an invoice he had obtained from the plaintiff which indicated that no sales tax would be charged on the transaction. He told Dunlap that he had lost or might lose a big sale of non-Hickory furniture to plaintiff. Dunlap gave the invoice to the Sales and Use Tax Division of the Massachusetts Department of Revenue and told the Golden Phoenix he was

working on the matter.[3] He called Hux and told him of the situation.

In August 1981, David Kaplan (of Kaplan) showed Dunlap plaintiff's literature, which he had obtained, as he was interested in plaintiff's prices and operation. He asked Dunlap why he was selling to her, and discussed her prices. Dunlap told Kaplan he was not selling to her and expressed displeasure that she was buying Hickory furniture from Tickle. He told Kaplan about his investigation of plaintiff's failure to charge sales tax.

Kaplan wrote or spoke to two other dealers and three other furniture representatives about plaintiff's discounting. In September 1981, plaintiff's husband visited Kaplan; Kaplan voiced his concern about plaintiff's pricing. Afterward, Kaplan told Dunlap about Mr. Moffat's visit.

In the fall of 1981, Stuart Swan (of Swan) discussed the plaintiff and her discounting with Dunlap. Dunlap told him plaintiff was buying from Tickle and about a transaction in which plaintiff did not charge sales tax. Swan had discussed plaintiff and her discounting with at least two representatives of other furniture manufacturers.

In about October 1981, plaintiff called Dunlap about buying Hickory furniture directly from Hickory. Dunlap refused and told her that she should go through Kaplan. Dunlap called Hux and told him that he had rejected plaintiff's request to be sold Hickory directly.[4]

In January 1982, Hickory adopted a Retail Furniture Store Marketing Policy ("the Policy"). It stated that Hickory's policy was not to sell its products to retail dealers who sell Hickory furniture at unauthorized locations or to unauthorized dealers, and

---

3. Until late summer or fall 1981, plaintiff failed to charge or remit a 5% sales tax on orders delivered in Massachusetts. Following an audit of her business by the Department of Revenue, in November 1981, she paid back sales taxes on prior in-state orders she had filled.

4. Dunlap has initial responsibility for approving new Hickory accounts in his territory. His decision not to approve a new account is almost always conclusive. His decision to approve a new account must be reviewed and affirmed by the Hickory sales and credit department.

reserved the right to terminate business with a dealer who made such sales.[5]

In February 1982, Harvest House received a copy of the Policy. That month or the next, the local Hickory sales representative told Harvest House to stop selling Hickory furniture to plaintiff, and it did so. Plaintiff began buying Hickory furniture from Country Furniture Co. of High Point, North Carolina, but from May on again had orders also filled by Harvest House.

In December 1982, after learning of these sales from discovery in this case, Hux sent letters to Harvest House and Country Furniture asking them to cease sales to plaintiff and stating that further sales to her would result in their termination as Hickory dealers. Both dealers sent letters to Hux stating that they would abide by the Policy and so informed plaintiff. By March 1983, however, Harvest House was again supplying plaintiff. When these sales were revealed in the discovery process in September 1983, the president of Hickory wrote to Harvest House stating that it would be terminated if it made further sales to plaintiff or her husband's company.

Hickory has not required that each of its dealers assent to the policy and has no comprehensive program for enforcing it, although it sometimes responds to information it receives. As of May 1983, it had investigated six reported violations of its policy, aside from those involving plaintiff.

■ Section 1 of The Sherman Act prohibits every "contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Defendants' motion for sum-

mary judgment is based primarily on the contention that the undisputed facts fail to establish any conspiracy between dealers and defendants.[6]

Plaintiff asserts, however, that these facts establish a two-fold conspiracy. First, she alleges that Lane, in response to dealers' complaints, refused to deal with Mrs. Moffat directly in order to protect the dealers from her price competition. Second, she asserts that, also in response to those dealers, Lane enforced the Policy so as to discourage Harvest House and Country Furniture from selling to her.

■ While summary judgment is to be used sparingly in antitrust litigation, *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), it may be appropriate, depending upon the circumstances of a particular case. *White v. Hearst Corp.*, 669 F.2d 14, 17 (1st Cir.1982) (upholding grant of summary judgment for defendants on Sherman Act claim). The party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 18.

■ To establish a vertical price-fixing conspiracy, such as the one plaintiff asserts resulted in the refusal to deal, "there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp.*, —— U.S. ——, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984). In *Monsanto*, the Court adopted

---

**5.** Until January 1982, Hickory had no such policy. The Policy was adopted in conjunction with the settlement of litigation brought against Lane by Herndon House, a Virginia furniture dealer, alleging that Hickory had terminated it as a dealer because of complaints by other dealers about price competition and transshipping to a North Carolina and Georgia dealer. Under the settlement, Lane reinstated Herndon House as a Hickory dealer; Herndon House agreed to abide by the Policy.

**6.** The parties have stipulated that Dunlap is a sales representative of Hickory. A corporation

cannot conspire with its own employees, *Walker v. Providence Journal Co.*, 493 F.2d 82, 87 (1st Cir.1974); *see also Card v. National Life Insurance Co.*, 603 F.2d 828 (10th Cir.1979); *H & B Equipment Company, Inc. v. International Harvester Co.*, 577 F.2d 239 (5th Cir.1978). While plaintiff has named Lane and Dunlap as separate conspirators in her complaint, she does not contend, in connection with the motion here, that Dunlap and Lane by themselves meet the plurality requirement of Section 1 of The Sherman Act.

the view a majority of circuits had taken,[7] holding that evidence of complaints followed by refusal to deal is not enough in itself to support the inference of such an agreement. The required additional showing can be made by evidence of a nexus between complaints and refusal to deal, or evidence of direct coercion. *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1263 (9th Cir.), *cert. dismissed,* —— U.S. ——, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983).

■ Plaintiff contends that dealer complaints caused defendants' refusal to sell to her. However, she has shown neither a significant number of complaints nor a resultant refusal to deal. Only one of the dealer communications to Dunlap or Lane can be clearly characterized as a complaint—the Golden Phoenix's July 1981 conversation with Dunlap. (The complaint of a lost sale, however, related to furniture other than Hickory's.) The parties agree that the initial communications from five dealers to Dunlap were "inquiries" about plaintiff. The later Golden Phoenix call to Hickory inquired "how plaintiff was selling at such a discount;" Kaplan and Swan's 1981 communications with Dunlap are described by the parties as "discussions" of plaintiff and her discounting. Even assuming that plaintiff is correct, however, and that an inference can be drawn that these communications were complaints,[8] plaintiff has failed to show a causal connection be-tween them and defendants' refusal to deal. She has adduced no evidence of any dealer threatening action against Lane if it dealt with plaintiff, or of Lane or Dunlap promising any dealer that it would not deal with plaintiff. *See Contractor Utility Sales v. Certain-Teed Products Corp.*, 638 F.2d 1061, 1076 (7th Cir.1981).[9] Moreover, defendants' uncontradicted affidavits show that their reason for refusing to sell to plaintiff as a dealer was her lack of appropriate facilities as well as the already sufficient number of Hickory outlets in the Boston area. Even viewed in the light most favorable to plaintiff, the evidence does not reasonably tend to prove a conscious commitment by defendants and dealers to a common scheme in connection with Dunlap's refusal to sell to plaintiff.[10]

Still less do the facts support plaintiff's second contention, that dealer pressures caused Hickory to enforce the policy against resale to unauthorized dealers. There is no evidence that any Massachusetts dealer was even aware that Harvest House or Country Furniture was supplying plaintiff. The only dealer communications of which Hux was aware were the Golden Phoenix call to the Hickory Chair customer services representative and its complaint to Dunlap. In light of *Monsanto*, it is clear that Hux's receipt of this one complaint (not directly related to sales by retailers to

---

7. *See Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257 (9th Cir.), *cert. dismissed,* —— U.S. ——, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983); *Bruce Drug, Inc. v. Hollister, Inc.*, 688 F.2d 853 (1st Cir.1982); *Davis-Watkins Co. v. Service Merchandise*, 686 F.2d 1190 (6th Cir.1982); *H.L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d 935 (2d Cir.1981), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); *Blankenship v. Herzfeld,* 661 F.2d 840 (10th Cir. 1981); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *contra, Bostick Oil Co. v. Michelin Tire Corp.,* 702 F.2d 1207 (4th Cir.), cert. denied, —— U.S. ——, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983).

8. Plaintiff would support this inference by evidence of Kaplan's complaints about plaintiff to other dealers, and Swan's deposition testimony that he was concerned about plaintiff's discounting.

9. In that case, where a competitor had repeatedly complained to other competitors and its supplier about plaintiff, but denied ever requesting the supplier to take action against plaintiff, and the supplier never stated that action would be taken, the Seventh Circuit held that there was not enough evidence to submit to the jury on the question of conspiracy. Pressure by competitors is not in itself enough to support the inference of a conspiracy, *H.L. Moore Drug Exchange v. Eli Lilly and Co.,* 662 F.2d 935, 945 (2d Cir.1981), nor is it enough that a supplier tell plaintiff's competitor in response to complaints that it is investigating plaintiff. *Id.*

10. Plaintiff's argument that Lane's enforcement of its resale policy was a continuation of such an earlier conspiracy therefore fails.

plaintiff) is insufficient to support the inference that his enforcement of the policy against those retailers was due to a conspiracy with the complainant. *See Bruce Drug, Inc. v. Hollister, Inc.,* 688 F.2d 853, 856 (1st Cir.1982).

■ Plaintiff contends, however, that concerted action may be inferred because the policy was aimed at discounting. She asserts that the policy has not been consistently enforced and that its exemption of interior decorators defeats its ostensible purpose of assuring that those selling Hickory furniture have adequate facilities. Even if plaintiff were correct, however,[11] the fact that a business reason advanced for action against plaintiff is pretextual does not without more justify the inference that the conduct was the result of a conspiracy. *Bruce Drug, Inc. v. Hollister, Inc.,* 688 F.2d 853, 857 (1st Cir.1982). Plaintiff has adduced no evidence reasonably tending to show a conscious commitment by dealers and defendants to a common scheme designed to achieve an unlawful objective in connection with Dunlap's refusal to deal with plaintiff or its enforcement of its resale policy. Defendants are therefore entitled to summary judgment on Count I of the complaint.

■ Turning to her claims under state law, plaintiff asserts that even in the absence of a conspiracy, defendants' action constituted an unfair method of competition or unfair act or practice actionable under Mass.Gen.Laws ch. 93A. As defendant points out, however, mere refusal to sell, without more, is not unlawful under 93A. *PMP Associates, Inc. v. Globe Newspaper Co.,* 366 Mass. 593, 596, 321 N.E.2d 915, 918 (1975). Nor is Lane's enforcement of the Policy conduct that is within an "established concept of unfairness," or is "immoral, unethical, oppressive, or unscru-

pulous," or "causes substantial injury to consumers;" thus, it falls without the definition of that prohibited by 93A. *Id.* at 596, (quoting *FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244–45 n. 5, 92 S.Ct. 898, 905–06 n. 5, 31 L.Ed.2d 170 (1972)). Accordingly, defendants are entitled to summary judgment on Count II of the complaint.

■ As for plaintiff's last claim, the parties agree that in order to constitute actionable interference with advantageous relations, defendant's enforcement of the policy must have been intentional and without justification. Such action is justifiable if "(a) the actor has an economic interest in the matter with reference to which he wishes to influence the policy of the other and (b) the desired policy does not unlawfully restrain trade ... and (c) the means employed are not wrongful." *Restatement (Second) of Torts* § 771 (1977). Defendants' affidavit attests to their economic interest in the matter, and the policy did not unlawfully restrain trade. Lane's enforcement of it by threatening to withdraw business from noncomplying retailers was not wrongful. *Restatement (Second) of Torts* § 768 comment (e); *Cernuto, Inc. v. United Cabinet Corp.,* 448 F.Supp. 1332 (W.D. Pa.1978), *rev'd on other grounds,* 595 F.2d 164 (3d Cir.1979).

Accordingly, defendants' motion for summary judgment is allowed on all counts of the amended complaint. Judgment may be entered for defendants.

11. Her argument at best is weak. She stresses the fact that Lane has no comprehensive enforcement program and had, as of May 1983, investigated only six reported violations of the policy other than those involving sales to plaintiff. Hux, however, has testified in an affidavit that every reported violation of the policy has been investigated and to his knowledge none is continuing. Plaintiff has produced no evidence contradicting Hux's testimony. The First Circuit has stated that a supplier is required merely to use means "reasonably suited" to its purpose in enforcing such resale restrictions. *Bruce Drug, Inc. v. Hollister, Inc.,* 688 F.2d 853, 860 (1st Cir.1982).