**WINTER HILL FROZEN FOODS AND SERVICES, INC., Plaintiff,**

v.

**The HAAGEN–DAZS COMPANY, INC., the Pillsbury Co., Inc., Paul's Distributors, Inc., Dairi Farms, Inc., International Ice Cream Corp., and B & K Distributors, Inc., Defendants.**

**Civ. A. No. 88–0009–XX.**

United States District Court, D. Massachusetts.

July 19, 1988.

James C. Donnelly, Jr., Robert L. Hamer and Joan O. Vorster, Mirick, O'Connell, De-Mallie & Lougee, Worcester, Mass., for Winter Hill Frozen Foods and Services, Inc.

Lawrence G. Green and Neill E. Silverman, Perkins, Smith, Arata & Howard, Boston, Mass., for Dairi Farms, Inc. and Paul's Distributors, Inc.

Richard Wegener, The Pillsbury Co., Minneapolis, Minn., William Miller, Pillsbury, Madison & Sutro, San Francisco, Cal., Stanley Gorrinson, Washington, D.C., and Philip J. MacCarthy, Worcester, Mass., for Haagen–Dazs Co., Inc. and Pillsbury Co., Inc.

Stanley Rudman, Dana Rodin, Rubin & Rudman, Boston, Mass., for Intern. Ice Cream Corp.

MEMORANDUM AND ORDER

YOUNG, District Judge.

Winter Hill Frozen Foods and Services, Inc. ("Winter Hill"), a frozen food distributor, brought this action against The Haagen–Dazs Company, Inc. ("Haagen–Dazs"), an ice cream manufacturer, The Pillsbury Co., Inc. ("Pillsbury"), the corporate parent of Haagen–Dazs, and the New England distributors of Haagen–Dazs products,[1] alleging that the defendants' refusal to sell Haagen–Dazs products to Winter Hill is an unlawful restraint of competition in violation of Section 1 of the Sherman Act, 15 U.S.C. sec. 1, and various state laws. This matter is presently before the Court on the motions by defendants Haagen–Dazs, Pillsbury, and International for summary judgment pursuant to Fed.R.Civ.P. 56.

## I. BACKGROUND

The plaintiff Winter Hill, a Massachusetts corporation with a usual place of business in Westborough, Massachusetts, is engaged in the distribution of a full line of frozen food products to retailers in New England, New York and New Jersey ("the New England area"). Winter Hill carries approximately 1,900 frozen food items, 400 of which are ice cream products and frozen desserts. In the New England area, there are at least 189 other distributors of frozen foods.

The defendant Haagen–Dazs, a New Jersey corporation with a usual place of business in Woodbright, New Jersey, manufactures ice cream and frozen desserts products including Haagen–Dazs brand ice cream, which are distributed nationally via company-owned and selected independent distributors. Haagen–Dazs is a wholly owned subsidiary of the defendant Pillsbury, a Delaware corporation with a principal place of business in Minneapolis, Minnesota.

The defendants Paul's, Dairi Farms, International and B & K are independent authorized distributors of Haagen–Dazs products in the New England area. Although Dairi Farms and International also carry some non-dessert frozen foods, these four defendants are primarily ice cream distributors. In addition to these four distributors, Haagen–Dazs also sells its ice cream to approximately 50 independent distributors in the New England area.

Beginning in 1983, Winter Hill purchased Haagen–Dazs ice cream products from the distributor B & K and then resold the ice cream to its customers; at that time, Winter Hill was not an authorized Haagen–Dazs distributor. In 1985, Haagen–Dazs undertook to identify and correct various weaknesses in its distribution system, including those instances where its product was being sold to frozen food or warehouse distributors.[2] At this time, Haagen–Dazs learned that B & K was selling the Haagen–Dazs product to Winter Hill, but it believed that Winter Hill's sales of ice cream were minor and only to military purchasers. Affidavit of Michael L. Baily at 10.

---

1. These distributors and co-defendants are Paul's Distributors, Inc. ("Paul's"), Dairi Farms, Inc. ("Dairi Farms"), International Ice Cream, Inc. ("International"), and B & K Distributors, Inc. ("B & K") (collectively, the "New England distributors.").

2. Haagen–Dazs states that it does not want its product distributed by frozen food or warehouse distributors whose primary stake is in products other than ice cream. Affidavit of James E. Richards at 2. It thereby seeks to maintain the focus of the independent distributor on the Haagen–Dazs product and thus to secure the greatest amount of freezer space for the product. *Id.*

Apparently, this battle for the limited amount of freezer space is an important element of distributing ice cream in the highly competitive frozen food and frozen desserts business. *See*

Affidavit of Michael L. Baily at 4. Mr. Baily, vice president, sales, of Haagen–Dazs, explained:

All products that occupy freezer space compete for that space. Ice creams compete against frozen pizza and vegetables. Only the winners—in terms of consumer takeaway—are awarded adequate shelf space ...

... Haagen–Dazs believes the frozen foods distributor has a substantially greater conflict of interest—if he fights for additional space for ice cream, he has to give up space that is occupied by the other frozen foods he sells. *Id.* at 5–6.

Moreover, Haagen–Dazs asserts that it prefers to have its distributors sell only to retail accounts, not to subdistributors, because Haagen–Dazs has no contractual or other control over subdistributors. *Id.* at 9.

After learning the extent of Winter Hill's sales to the military, Haagen–Dazs decided that B & K should not continue to supply ice cream to Winter Hill, and on August 1, 1987, Haagen–Dazs wrote B & K requesting that it discontinue sales to Winter Hill effective October 1, 1987. B & K's sales of Haagen–Dazs to Winter Hill ended on November 30, 1987.

Paul's, Dairi Farms and International have never sold—and have refused to sell—Haagen–Dazs ice cream to Winter Hill.

On January 20, 1988, Winter Hill brought this action against the named defendants to preliminarily enjoin these defendants' refusal to deal with, and to sell Haagen–Dazs products to, Winter Hill. In the complaint, Winter Hill alleges:

1) the agreement between Haagen–Dazs and its distributors to refuse sales of Haagen–Dazs products to Winter Hill is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. sec. 1 ("Count I");

2) the agreement between Haagen–Dazs and its New England distributors to refuse sales of Haagen–Dazs products to Winter Hill is an unreasonable restraint of trade in violation of Mass.Gen.Laws ch. 93, sec. 4 ("Count II");

3) Haagen–Dazs' conduct constitutes a tortious interference with Winter Hill's contractual relations and advantageous business relationships with its existing customers ("Count III"); and

4) Haagen–Dazs' conduct constitutes unfair acts or business practices in violation of Mass.Gen.Laws ch. 93A, secs. 2 and 11 ("Count IV").

On February 16, 1988, the Court denied Winter Hill's motion for preliminary injunction without prejudice, and denied Haagen–Dazs' and Pillsbury's motion to dismiss the complaint on February 22, 1988. Defendants Haagen–Dazs, Pillsbury, and International now move the Court, pursuant to Fed.R.Civ.P. 56(c), for summary judgment on the grounds that there is no genuine issue as to any material fact and that they are entitled to judgment as matter of law.

## II. DISCUSSION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure,[3] the party seeking summary judgment must inform the court of the basis of its motion and identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Where, however, the nonmoving party will bear the burden of proof on an issue at trial, "Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553; *see Moody v. Maine Central R.R. Co.*, 823 F.2d 693, 694 (1st Cir.1987); *Jako v. Pilling Co.*, 670 F.Supp. 1074, 1076 (D.Mass.1987), *vacated and rev'd in part*, 848 F.2d 318 (1st Cir.1988).

---

**3.** Fed.R.Civ.P. 56 provides, in relevant part:

. . . . .

(c) Motion and Proceedings Thereon.... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

. . . . .

(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

*Cf. Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976) (nonmovant must establish by substantial evidence the existence of an issue of fact that is both genuine and material).

**A. Counts I and II—The Alleged Antitrust Violations.**

■ Winter Hill asserts that the agreement between Haagen–Dazs and its distributors to refuse to sell Haagen–Dazs products to Winter Hill is an unreasonable restraint of trade in violation of both Section 1 of the Sherman Act,[4] 15 U.S.C. sec. 1, and Mass.Gen.Laws ch. 93, sec. 4.[5] In order to survive this motion for summary judgment, Winter Hill must establish that there is a genuine issue of material fact as to whether the defendants entered into an illegal conspiracy that caused Winter Hill to suffer a cognizable injury. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Winter Hill asserts that the material issues of disputed fact are the following: 1) whether Haagen–Dazs has gone beyond the "mere announcement of a policy" and "simple refusal to deal;" 2) whether Haagen–Dazs has achieved "market power," i.e., the ability to set prices which are higher than the competition without losing the ability to sell its products; 3) whether the vertical restriction against sales to Winter Hill is harmful to competition either at the interbrand or intrabrand level, and 4) whether such harm to competition outweighs any benefit resulting from the restriction. Winter Hill's Memorandum in Opposition to Defendants' Motions for Summary Judgment at 2–3 (hereinafter "Winter Hill's Memorandum in Opposition to Summary Judgment"). On

Counts I and I, Winter Hill does not succeed.

*1. The Refusal to Deal.*

■ It is a well established principle of antitrust law that "[a] manufacturer ... generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) (citing *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 [1919]) and *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 [1960]). The *Colgate* Court explained:

> The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.

250 U.S. at 307, 39 S.Ct. at 468. Therefore, a mere unilateral refusal to deal, without more, is not cognizable under Section 1 of the Sherman Act. *See, e.g., Parke, Davis,* 362 U.S. at 37, 80 S.Ct. at 508; *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,* 602 F.2d 1025, 1033 (2d Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172

---

**4.** Section 1 provides, in relevant part:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.
15 U.S.C. sec. 1 (1982).

**5.** Section 4 of the Massachusetts Antitrust Act provides:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint

of trade or commerce in the commonwealth shall be unlawful.
Mass.Gen.Laws Ann. ch. 93, sec. 4 (West 1984). This statute is construed in harmony with Section 1 of the Sherman Act, and the same principles and analysis under the federal claim apply to this particular state law claim. *See* Mass. Gen.Laws Ann. ch. 93, sec. 1 (West 1984). Therefore, Winter Hill's state antitrust claims are subsumed by this discussion of federal antitrust law.

(1979); *Butera v. Sun Oil Co.*, 496 F.2d 434, 437 n. 7 (1st Cir.1974).

All refusals to deal, however, are not beyond the reach of the antitrust laws. The Supreme Court has explicitly ruled that

> When the manufacturer's actions, as here, go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices, this countervailing consideration [the right of the manufacturer to decide with whom to deal] is not present and therefore he has put together a combination in violation of the Sherman Act.

*Parke, Davis*, 362 U.S. at 44, 80 S.Ct. at 512. The boundry separating the *Colgate* doctrine—the simple unilateral refusal to deal—from the non-simple unilateral refusal to deal is the presence of a "contract, combination, or conspiracy:" that is, either an express, implied or tacit agreement among two or more parties, or an involuntary acquiescence to one party's trade restraining policy. *See generally* 2 Kintner *Federal Antitrust Law* sec. 10.22 at 137 (1980).[6] In this context, the Supreme Court has ruled repeatedly that where a manufacturer's refusal to deal either promotes or enforces a trade policy which is unreasonable *per se*, the manufacturer's refusal is a *per se* violation of Section 1. *E.g., Federal Trade Comm'n v. Beech–Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922) (holding that a company's refusal to deal with those dealers who did not observe resale prices violated Section 5 of the Federal Trade Commission Act); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 723, 64 S.Ct. 805, 813, 88 L.Ed. 1024 (1944) (holding that "[m]ore ... than

mere acquiescence of wholesalers" to a resale price maintenance scheme constituted a violation of Section 1); *Parke, Davis*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (ruling that when a manufacturer goes beyond the mere announcement of a pricing policy [i.e., having the wholesalers terminate the sales to those retailers who do not abide by the policy], an unlawful combination in violation of Section 1 exists).[7]

Evidence of "a contract, combination or conspiracy," however, does not, without more, violate Section 1 of the Sherman Act. *See, e.g., A.H. Cox & Co. v. Star Machinery Co.*, 653 F.2d 1302, 1305–06 (9th Cir.1981) (Kennedy, J.); *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 298 (5th Cir. Unit A, July, 1981); *Fuchs Sugar*, 602 F.2d at 1030. Rather, there must be compelling proof that the refusal to deal was motivated by anticompetitive purposes, or will produce an anticompetitive effect. *See, e.q., Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir.) (en banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed. 2d 338 (1978) ("[S]omething more than an agreement between [a manufacturer and a distributor] must be shown. The agreement becomes violative of Section 1 of the Sherman Act only if it is *anticompetitive in purpose and effect*—in sum, it must be tested by the rule of reason.") (emphasis in original); *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1223 (10th Cir.1986), *cert. denied*, — U.S. —, 108 S.Ct. 1728, 100 L.Ed.2d 192 (1988); *cf. Local Beauty Supply, Inc. v. Lamaur, Inc.*, 787 F.2d 1197, 1200 (7th Cir.1986) (holding that otherwise lawful non-price mechanism agreements between a manufacturer and a distributor may be rendered *per se* unlaw-

---

6. Yet, even where such a "combination contract or conspiracy" exists, there is not necessarily a violation of Section 1 of the Sherman Act; the complainant must still prove that the manufacturer's policy constitutes an unlawful restraint of trade. *See* 2 Kintner *Federal Antitrust Law* sec. 10.20 at 133.

7. The Court notes that there is a distinction between a non-simple unilateral refusal to deal and a concerted refusal to deal, which is also known as a "group boycott." *See* Horsley, *Per Se Illegality and Concerted Refusals to Deal*, 13

B.C. Indus. & Com.L.Rev. 484 (1972). A concerted refusal to deal is defined as "an agreement by two or more persons not to do business with other individuals, or to do business with them only on specified terms." Note, *Concerted Refusals to Deal Under the Federal Antitrust Laws*, 71 Harv.L.Rev. 1531 (1958). Although direct evidence of an explicit agreement that restricts dealing with a third party is not necessary for finding "concerted action," this Court cannot find sufficient evidence of a "boycott" in this particular case.

ful if imposed as part of an illegal scheme to fix prices). Therefore, regardless whether a combination or conspiracy between a manufacturer and its dealer exists, this Court's analysis is based upon the fundamental premise of antitrust law: whether a particular trade policy or practice imposes an unreasonable restraint on competition.[8] More precisely, the central issue in this case is whether a manufacturer's termination of an unauthorized distributor constitutes an unreasonable restraint on competition.[9] The Court rules that it does not.

### 2. Distributorship/Dealership Terminations.

Under the Rule of Reason, the standard for lawful trade practices has been described as follows:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after

the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

*Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 n. 15, 97 S.Ct. 2549, 2557 n. 15, 53 L.Ed.2d 568 (1977) (quoting *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 [1918] [Brandeis, J.]). Simply, "the fact-finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V.*, 433 U.S. at 49, 97 S.Ct. at 2557 (footnote omitted).

In the context of distributorship/dealership terminations, manufacturers are generally permitted a wide latitude to discontinue relationships with distributors, to determine the profile of its distributorship, and to otherwise establish vertical nonprice restraints. *See, e.g., Chandler Supply Co. v. GAF Corp.*, 650 F.2d 983, 989 (9th Cir.1980) (manufacturer

---

**8.** This Court, therefore, need not address the issue of whether there exists a "contract, combination or conspiracy" between Haagen–Dazs and the New England distributors in the present case.

If, however, this Court were to decide this issue, there must be "something more than evidence of complaints [from the nonterminated distributors] ... there must be evidence that tends to exclude the possibility that the manufacturers and nonterminated distributors were acting independently." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984); *see Bruce Drug, Inc. v. Hollister, Inc.*, 688 F.2d 853, 856–57 (1st Cir.1982). "[T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" 465 U.S. at 764, 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 [3d Cir.1980], *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 [1981]). Moreover, the plaintiff must present evidence "both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer." *Id.* 465 U.S. at 764 n. 9, 104 S.Ct. at 1471 n. 9.

Furthermore, the finding that an unlawful conspiracy exists cannot be supported by the mere fact that the court determines that the business reasons for certain trade practices are pretextual. *See Bruce Drug*, 688 F.2d at 857. Applying these evidentiary standards to the case at bar, it does not appear that Winter Hill has presented sufficient evidence to support the finding of a conspiracy; the Court, however, does not rule on this particular issue.

**9.** Winter Hill concedes that this case is governed by the "Rule of Reason," not the *per se* rules of antitrust illegality. *See* Winter Hill's Memorandum in Opposition to Defendants' Motions for Summary Judgment at 14 (hereinafter, "Winter Hill's Memorandum in Opposition to Summary Judgment"). Since Winter Hill does not allege any "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use," *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), the *per se* rules do not apply. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557–2558, 53 L.Ed.2d 568 (1977).

was dissatisfied with the franchisee's service); *Edward J. Sweeny & Sons,* 637 F.2d at 110 (franchisee's service stations had produced a number of customer complaints); *White v. Hearst Corp.,* 669 F.2d 14, 18–19 (1st Cir.1982) (manufacturer had decided to establish an in-house method of distribution). The policy for allowing manufacturers to establish certain vertical non-price restraints is basic: such restrictions may have pro-competitive effects. Addressing the manufacturer's decision to impose vertical nonprice restraints, the Supreme Court stated:

> [N]ew manufacturers and manufacturers entering new markets can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer. Established manufacturers can use them to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products. Service and repair are vital for many products.... The availability and quality of such services affect a manufacturer's goodwill and the competitiveness of his product. Because of market imperfections such as the so-called 'free-rider' effect, these services might not be provided by retailers in a purely competitive situation, despite the fact that each retailer's benefit would be greater if all provided the services than if none did.

*Business Electronics Corp. v. Sharp Electronics Corp.,* —— U.S. ——, 108 S.Ct. 1515, 1519–20, 99 L.Ed.2d 808 (1988) (quoting *Continental T.V.,* 433 U.S. at 55, 97 S.Ct. at 2560). The Supreme Court, in *Continental T.V.,* explained that, although vertical restrictions reduce intrabrand competition by limiting the number of sellers of a particular product, "[v]ertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products." [10] 433 U.S. at 54, 97 S.Ct. at 2559. Therefore, a plaintiff asserting that a distributorship termination violates Section 1 of the Sherman Act must present facts *proving that competition has been injured rather than merely a competitor. Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 734 (9th Cir.1987). In this regard, it must be stressed that the antitrust laws were not established for the protection of a particular competitor, rather the protection of competition. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Under the rule of reason analysis, Winter Hill's antitrust claims cannot survive the defendants' motions for summary judgment on the ground that, as matter of law, there is not sufficient evidence establishing the existence of antitrust injury.

First, Winter Hill asserts that Haagen–Dazs has market power in the super premium ice cream market,[11] and that such mar-

**10.** The *Continental T.V.* Court further noted that market efficiency is not the only permissible reason for a manufacturer to exercise control over the sales and servicing of a product. 433 U.S. at 55 n. 23, 97 S.Ct. at 2560 n. 23. "As a result of statutory and common-law developments, society increasingly demands that manufacturers assume direct responsibility for the safety and quality of their products.... The legitimacy of these concerns has been recognized in cases involving vertical restrictions." *Id.* In the present case, Haagen–Dazs asserts that "[i]ce cream requires more careful handling than other frozen foods. Because ice cream is perishable and sensitive to changes in temperatures, distribution involves a risk that the product may be mistreated." Affidavit of Michael L. Baily at 7. The Court thus acknowledges that the quality and safety of the product

constitute a basis for vertical non-price restrictions.

**11.** For the purposes of this opinion, super premium ice cream is defined as that ice cream containing all natural ingredients, with a higher butterfat and a lower air content than other ice creams. *See* Declaration of Jerry A. Hausman at 4; Affidavit of Harold R. Rudnick in Opposition to the Motion by the Pillsbury Company and the Haagen–Dazs Company, Inc. for Summary Judgment at 3 (hereinafter, "Rudnick Aff. II"). Furthermore, the super premium ice cream is sold only in pints and for prices which are higher than other ice creams. *See* Rudnick Aff. II at 3. In the New England area, the super premium ice cream market includes the following brands of ice cream: Haagen–Dazs, Frusen Gladje, Ben & Jerry's, and Steve's.

ket power allows Haagen–Dazs to raise its prices above those of the competition.[12] Affidavit of Harold R. Rudnick at 2 (hereinafter, "Rudnick Aff. I"); Rudnick Aff. II at 5–9. Where there are vertical nonprice restraints, some circuits have ruled that a threshold inquiry in rule of reason analysis is whether the defendant has market power. *See, e.g., Assam Drug Co. v. Miller Brewing Co.*, 798 F.2d 311, 315–16 (8th Cir.1986); *Hennessy Indus. Inc. v. FMC Corp.*, 779 F.2d 402, 404–05 (7th Cir.1985). Market power is often defined as the "'power to raise prices significantly above the competitive level without losing all of one's business,'" *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir.1987) (quoting *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 745 [7th Cir.1982] [*Valley I*], cert. denied, —— U.S. ——, 108 S.Ct. 488, 98 L.Ed.2d 486 [1987]), and market power is often inferred from the control of a "'substantial percentage of the sales in a market carefully defined in terms of both product and geography.'" *Id.* (quoting *Valley I*, 678 F.2d at 745). Based upon those facts that Winter Hill presented to this Court, there is insufficient evidence to raise a genuine issue of material fact regarding Haagen–Dazs' market power.

Winter Hill asserts that Haagen–Dazs has a 43% market share of the super premium ice cream market in New England.[13] A 43% market share, however, does not alone establish that Haagen–Dazs has market power. *See Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 841 (2d Cir.1980) (market share declining from 54.5% to 33% over five years insufficient to establish market power); *Broadway Delivery Corp. v. United Parcel Service of America, Inc.*, 651 F.2d 122, 129 (2d Cir.), cert. denied, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981) (market share below 50% is rarely evidence of monopoly power). *Cf. Graphic Prod. Distrib., Inc. v. Itek Corp.*, 717 F.2d 1560, 1570 (11th Cir. 1983) (70–75 per-cent market share constitutes sufficient evidence of market power). Moreover, in the context of evaluating whether a particular competitor has market power, the competitor's declining market share is evidence that such competitor lacks such power, although it is not dispositive. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 273 n. 11 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). From the A.C. Nielson data regarding the sales of ice cream in New England, the Court notes that Haagen–Dazs' market share in

12. As a preliminary matter, the Court does not decide the issue whether there in fact exists a separate market for super premium ice cream; rather, it assumes *arguendo* that such a market does exist.

If the Court were to decide this issue, the evidentiary burden falls on the plaintiff Winter Hill to establish a well-defined relevant market upon which anticompetitive actions had a substantial impact. *See Kartell v. Blue Shield of Massachusetts, Inc.*, 582 F.Supp. 734, 742 (D.Mass.1984), *reversed and vacated in part on other grounds*, 749 F.2d 922 (1st Cir.1984), cert. denied, 471 U.S. 1029, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985). To demonstrate the separate existence of a super premium ice cream submarket, Winter Hill must prove those submarket elements such as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962) (footnote omitted). Given these requisite factors for determining the exist-

ence of a submarket, this Court concludes that the two affidavits of Harold Rudnick would be insufficient to establish a distinct market for super premium ice cream. Moreover, in similar litigation filed in the United States District Court for the Northern District of California, Judge Legge ruled that "[a]ll grades of ice cream compete for both retail shelf space and for consumers' attention," and there is not, therefore, a separate market for super premium ice cream. *In re Super Premium Ice Cream Distribution Antitrust Litigation*, 691 F.Supp. 1262, 1268 (N.D.Cal.1988). The Court, however, does not decide this issue.

13. Harold Rudnick, president of Winter Hill, asserts that the market shares of the super premium ice creams in New England from December, 1986 through November, 1987 are the following: Haagen–Dazs—43%, Ben & Jerry's—41%, Frusen Gladje—8%, and Steve's—8%. Rudnick Aff. II at 10. Haagen–Dazs, however, notes that in the October—November, 1987 reporting period, Haagen–Dazs' market share was only 39%, while Ben & Jerry's was 45%. Declaration of Jerry A. Hausman at 10.

the super premium ice cream market declined from 61% in 1985 to 50% in 1986 to 43% in 1987. *See* Exhibit E, Declaration of Jerry A. Hausman. Therefore, the data concerning both Haagen–Dazs' historical and current market shares demonstrates that Haagen–Dazs indeed lacks market power in the super premium ice cream market,[14] and thus would preclude the need to further balance the competitive effects of Haagen–Dazs' restraint under rule of reason analysis. *See Assam Drug,* 798 F.2d at 316.

▪ Regardless, however, of this Court's conclusion that Haagen–Dazs lacks market power, the Court further rules that Winter Hill has failed to prove that there are anti-competitive effects resulting from terminating sales of Haagen–Dazs products to Winter Hill. Under the rule of reason inquiry, the Court must compare the negative effects of the restraint on intrabrand and interbrand competition, if any, with any alleged positive effects on interbrand competition stemming from the restraints. *See Graphic Prods. Distrib.,* 717 F.2d at 1571. Winter Hill asserts that the price of a pint of Haagen–Dazs ice cream at Pease Air Force Base near Portsmouth, New Hampshire, has increased from $1.49 to $1.60, and at Griffiss Air Force Base near Syracuse, New York, the price has risen from $1.49 to $1.70. Winter Hill's Memorandum in Opposition to Defendants' Motions for Summary Judgment at 26. Winter Hill also alleges that B & K approached Trucchi's Supermarket, a Winter Hill customer in Raynham, Massachusetts, and proposed to charge $12.50 per case of

Haagen–Dazs ice cream, a 21% increase over Winter Hill's price of $10.29 per case. *Id.* In short, these isolated examples of price increases in Haagen–Dazs ice cream products are insufficient to establish that there are anti-competitive effects resulting from Winter Hill's termination. Accordingly, this Court grants the motions for summary judgment of Haagen–Dazs, Pillsbury and International on the antitrust claims, Counts I and II.

**B. Count III—Interference with Advantageous Business Relations.**

▪ As for this claim, Winter Hill must show " '(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and malicious interference with it; (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct.' " *Comey v. Hill,* 387 Mass. 11, 19, 438 N.E.2d 811 (1982) (quoting J. Nolan, *Tort Law* sec. 72, at 87 [1979]). Such conduct, however, must have been done without justification. Justification is established when " '(a) the actor has an economic interest in the matter with reference to which he wishes to influence the policy of the other and (b) the desired policy does not unlawfuly restrain trade ... and (c) the means employed are not wrongful.' " *Moffat v. Lane Co.,* 595 F.Supp. 43, 49 (D.Mass.1984) (quoting Restatement (Second) of Torts sec. 771 [1977]). Haagen–Dazs, Pillsbury and International have proved that 1) they have an economic interest in the matter, *see* Affidavit of Michael L. Baily (Haagen–Dazs

---

**14.** Winter Hill further contends that Haagen–Dazs' market power stems from its ability to raise prices above competitive levels without losing customers, and states, "Haagen–Dazs is the price leader and is usually sold in supermarkets at prices which are more than 10 cents per pint above the price of any other super premium ice cream. Special flavors are priced 10 to 15 cents higher than that." Rudnick Aff. II at 9. First, the Court questions Mr. Rudnick's conclusion that Haagen–Dazs is the price leader where Winter Hill's October 14, 1987 order guide contains the following suggested retail prices for 16–ounce packages of frozen desserts: Howard Johnson—$1.79, Dole—$1.98, Tofutti—$2.79, Haagen–Dazs–$1.89, Frusen Gladje—$2.08,

Mousse d'Jour—$1.99, and Steve's—$2.19. Affidavit of Michael L. Baily, Exhibit B. Second, and more importantly, this conclusory statement of the pricing differentials in the super premium ice cream market, which is not supported by specific factual data, is insufficient evidence that Haagen–Dazs is in fact the price leader in the market. *Cf. United States v. Hall,* 424 F.Supp. 508, 533–34 (W.D.Okla.1975) (holding that a motion requesting a trial judge to disqualify himself and the affidavit in support thereof were insufficient in part due to their conclusory nature), *aff'd,* 536 F.2d 313 (10th Cir.) *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976).

and Pillsbury), Affidavit of Bruce C. Ginsberg (International), 2) the conduct does not unlawfully restrain trade, *see* Section II (A), *supra,* and 3) the conduct was not wrongful pursuant to *Moffat,* 595 F.Supp. at 49. Accordingly, the actions of the defendants Haagen–Dazs, Pillsbury and International were justifiable and, therefore, the Court grants their motions for summary judgment on Count III.

### C. Count IV—Unfair Competition.

 In considering whether Winter Hill has established an unfair practice under Mass.Gen.Laws ch. 93A, the Court must consider " '1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; 2) whether it is immoral, unethical, oppressive, or unscrupulous; 3) whether it causes substantial injury to consumers (or competitors or other businessmen).' " *PMP Associates, Inc. v. Globe Newspaper Co.,* 366 Mass. 593, 596, 321 N.E.2d 915 (1975) (quoting 29 Fed.Reg. 8325, 8355 [1964]); *see also Moffat,* 595 F.Supp. at 49. The case law is clear that the defendants' conduct does not fall within the scope of unfairness prohibited by Section 93A.

Accordingly, the Court grants the motions for summary judgment of Haagen–Dazs, Pillsbury and International on all counts of the complaint.