REMCO DISTRIBUTORS, INC., Plaintiff,

v.

ORECK CORPORATION, Defendant.

Civ. No. 91–40106–XX.

United States District Court, D. Massachusetts.

April 28, 1992.

Eric I. Zucker, Deutsch, Williams, Brooks, DeRensis, Holland & Drachman, Boston, Mass., for plaintiff.

Thomas D. Burns, Gary W. Smith, Burns & Levinson, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

### I.

This is a diversity case in which the plaintiff seeks to recover for wrongful termination, breach of contract (including breaches of the implied covenant of good faith and fair dealing), and violations of Mass.Gen.L. chs. 93 and 93A.

This case was originally filed in Norfolk Superior Court and later removed to federal court by the defendant in July 1991.[1] This court has personal jurisdiction over the defendant by virtue of the Massachusetts long arm statute, Mass.Gen.L. ch. 223A, § 3, since the defendant engaged in business within the Commonwealth.

The defendant has moved under Fed. R.Civ.P. 12(b)(6) to dismiss the complaint. Having heard oral argument of the parties and for the reasons stated below, I will grant the motion.

### II.

The plaintiff, Remco Distributors, Inc. ("Remco"), is a Massachusetts corporation based in Bellingham. The defendant, Oreck Corporation ("Oreck"), is a Louisiana corporation based in New Orleans. In 1984 Oreck appointed Remco its exclusive wholesale distributor within the New York/New England region for certain Oreck products (i.e., vacuum equipment and accessories). The basis for this arrangement was an oral agreement effected by a Remco representative and Oreck's national sales manager; throughout the time period in question, there was no written contract governing the relationship between the parties.

---

1. I note as a preliminary matter that while there is diversity of the parties, the court may only infer from the pleadings filed in this case that the amount in controversy is over $50,000.

Remco alleges that initially, Oreck accorded Remco wide latitude in interacting with Oreck's field sales representatives, in effect allowing Remco to direct the actions of Oreck employees in order to achieve better customer service. But with the hiring of a new national sales manager at Oreck in October 1987, the Oreck/Remco relationship changed. Oreck reined in the independent operations of its field sales representatives, in part by denying Remco access to call reports and other sales representative data to which Remco had previously enjoyed access. Oreck also attempted to reduce Remco's profit levels to what Remco characterizes in its complaint as an "unacceptable level" by imposing mandatory master distributor and dealer prices upon Remco and its retail dealer network.

These actions were taken at the same time Oreck itself was promoting sales in the region through direct marketing efforts and through special offerings to American Express card members. The prices at which consumers could obtain Oreck products directly from Oreck or through American Express were lower than the mandatory prices which Remco was supposed to be charging through its retail dealers.[2] Remco alleges that it was "specifically advised" by Oreck that it (Remco) could not offer Oreck products at prices below those offered through the American Express direct mailings; however, the complaint does not set forth the facts as to how that "advice" was communicated, nor what (or whether) Oreck communicated to Remco as to the potential consequences of Remco's not abiding by that "advice."

At that time, Oreck also allegedly took actions with respect to product advertising and promotions which interfered with Remco's long-standing prerogatives in those business areas. Those actions are said by Remco to have resulted in a number of negative consequences: increased administrative costs, reduced market penetration, and dampened interest on the part of Remco's retail dealer network.

Remco repeatedly made Oreck aware of these problems, to which it attributed its declines in sales. However, Oreck's response was to remove New York State from Remco's designated territory in 1989, and to continue to hold Remco responsible for the declining sales in New England, notwithstanding what Remco contends were problems caused by Oreck itself. Those problems included inadequate Oreck sales force response to problems experienced by Remco's retail dealers, occasioned, alleges Remco, by Remco's loss of control over the field sales representatives. In turn, Oreck's national sales manager blamed the root problems on Remco.

Remco further alleges that in 1989 Oreck staged a sham blow-up with Remco over an advertising promotion which Remco ran and which Oreck contended was a source of discontent within the Remco retail network. The result of this blow-up, both parties agree, was that Remco resigned as an Oreck distributor as of May 1, 1989.

Remco asserts that as a consequence of its having resigned its Oreck distributorship, the parties orally agreed that Oreck would: 1) repurchase all parts and certain inventory from Remco; 2) purchase or otherwise guarantee Remco's receivables from its retail dealer network; and 3) honor all product orders placed by Remco by May 1, 1989, per previously-established practice of the parties. Oreck denies the existence of any such agreement.

Remco asserts that thereafter, Oreck refused to honor product orders for 950 units which were placed by Remco before May 1, 1989, and that Oreck also failed to purchase or to otherwise guarantee more than $10,000 of Remco's receivables.

### III.

Remco is proceeding with four legal claims:

1) Wrongful termination;

---

2. The plaintiff alleges in the same paragraph of its complaint both that the mandatory prices were too high because consumers could pay less for the same Oreck product through American Express, and that the mandatory prices were too low, because they reduced Remco's margins to an unprofitable level.

2) Breach of contract;

3) Anti-trust violations (Mass.Gen.L. ch. 93); and

4) Unfair and deceptive trade practices (Mass.Gen.L. ch. 93A).

■ In ruling on a Rule 12(b)(6) motion, a court must "accept all well-pled averments as true, and draw all reasonable inferences therefrom in [the plaintiff's] favor." *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989). However, a plaintiff may not rely merely upon "bald assertions" or "unsupportable epithets" to establish its claims; a plaintiff must set forth in its complaint "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory." *Id.* I deal with each of Remco's claims in turn.

*1. Wrongful Termination*

Remco alleges that Oreck's conduct constituted a wrongful termination effected in bad faith and in violation of the contractual relationship between the parties, as well as the covenant of good faith and fair dealing implicit in every contract.

■ Under Massachusetts law, wrongful termination claims are typically made by employees against former employers. *See, e.g., Madsen v. Erwin,* 395 Mass. 715, 481 N.E.2d 1160 (1985). In the absence of a written employment contract, wrongful termination claims may survive only where there is a showing of employer bad faith or where the discharge deprived the plaintiff of future compensation for past service, *id.* at 725–26, 481 N.E.2d 1160, or where the discharge is in contravention of public policy. *See Wright v. Shriners Hospital,* 412 Mass. 469, 589 N.E.2d 1241 (1992); *DeRose v. Putnam Management Co.,* 398 Mass. 205, 496 N.E.2d 428 (1986).

■ Wrongful termination claims are also recognized where there is no employee/employer relationship, but where the parties' relationship has been defined in a written contract. *See, e.g., Ghoti Estates v. Freda's Capri Restaurant, Inc.,* 332 Mass. 17, 123 N.E.2d 232 (1954) (written lease); *Town Planning & Engineering Associates, Inc. v.*

*Amesbury Specialty Co.,* 369 Mass. 737, 342 N.E.2d 706 (1976) (written contract for services). In such cases, the parties are bound not only by the terms of the contract, but by the covenant of good faith and fair dealing implicit in every contract.

■ Remco was clearly not an employee of Oreck. Moreover, Remco has not alleged facts which, even read in the light most favorable to Remco, could establish that there was any kind of contractual relationship with Oreck. There was no written contract spelling out the rights and obligations of the respective parties, nor has Remco asserted facts which could establish that there was an enforceable oral agreement between the parties. At most, the parties had an "at-will" relationship which could be terminated by either party. Massachusetts has not adopted a general rule that the covenant of good faith and fair dealing exists in at-will relationships. *Elfman & Sons, Inc. v. Criterion Mills, Inc.,* 774 F.Supp. 683, 687 (D.Mass.1991); *see also Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977). Furthermore, termination of a distributorship or franchise alone does not establish bad faith. *Elfman & Sons, Inc.,* 774 F.Supp. at 687. And as discussed below in the context of the Massachusetts Antitrust Statute, Mass.Gen.L. ch. 93, Remco has failed to set forth facts from which a reasonable fact finder could conclude that Oreck's actions were contrary to public policy.

Remco also admits in its complaint that it relinquished its role as an Oreck distributor, thereby nullifying its wrongful termination claim, although its admission is cloaked in intimations of coercion by Oreck. In effect, Remco asserts that Oreck constructively terminated the parties' relationship. While Massachusetts courts have recognized constructive termination claims, such recognition has occurred in cases involving statutes that are not at issue in this case. *See, e.g., Imperial Motors, Inc. v. Chrysler Corporation,* 559 F.Supp. 1312 (D.Mass.1983) (Dealers' Day in Court Act); *Tonnessen v. Youville Hospital,* No. 84–315, 1984 WL 1151 (D.Mass. July 5, 1984) (slip opinion) (42

U.S.C. § 1983 and Section 504 of the Rehabilitation Act of 1973).

In *Imperial Motors,* the court held that it could consider a constructive termination claim under the Dealers' Day in Court Act only if the termination was "the result of actions taken by a manufacturer with the intent to intimidate, threaten or coerce." *Imperial Motors,* 559 F.Supp. at 1315. Even assuming that an identical standard would be applicable in this case, Remco has failed to set forth facts to support its claim that Oreck intended to intimidate, threaten or coerce Remco. In addition, Remco has also failed to provide any factual allegations for its conclusory assertion that Oreck engaged in a course of conduct which was designed to induce Remco to terminate its distributorship relationship.

In short, Remco has failed to plead sufficient factual allegations regarding the material elements necessary to sustain its claim of wrongful termination.

### 2. *Breach of Contract*

Remco's second count seeks recovery for Oreck's refusal to fill product orders during the weeks preceding Remco's termination of its distributorship relationship with Oreck, and for Oreck's refusal to guarantee Remco's receivables from its retail dealer network. Remco contends that Oreck was bound by the terms of their previously existing relationship to fill Remco's orders at least until May 1, 1989.

In its complaint, Remco alleges that it "insisted that if it were to be forced to resign," Oreck *should* undertake certain obligations. However, Remco has not pled any facts from which a reasonable fact finder could conclude that the parties' discussions prior to May 1, 1989 created any enforceable agreement between the parties, much less one in which Oreck guaranteed Remco's receivables and agreed to fill further Remco orders.

Therefore, I find that Remco has failed to plead sufficient facts to sustain its breach of contract claim.

### 3. *Antitrust violations*

Remco asserts that Oreck's conduct during the period in question constituted "willful, knowing, and malicious violations" of the Massachusetts Anti-trust Statute, Mass. Gen.L. ch. 93, §§ 4 and 12, and that Oreck's intentions were intended to injure Remco in its business.

Section 4 of ch. 93 reads as follows:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the commonwealth shall be unlawful.

Section 12 of ch. 93 authorizes private rights of action, including the recovery of attorney fees and treble damages, if the court finds that the statutory violation was engaged in with malicious intent.

Section 1 of ch. 93 states that "[t]his chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable." In *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), a Sherman Act case, the Supreme Court recognized the right of a manufacturer engaged in purely private business to exercise its discretion as to the parties with which it will deal. *Id.* at 307, 39 S.Ct. at 468. This principle was reaffirmed in *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984).

Therefore, Oreck's unilateral refusal to deal with Remco, without something more, is not cognizable under Section 1 of the Sherman Act, nor under Mass.Gen.L. ch. 93. *Winter Hill Frozen Foods & Services, Inc. v. Haagen–Dazs Co., Inc.,* 691 F.Supp. 539, 543 (D.Mass.1988). The "something more" must be "either an express, implied or tacit agreement among two or more parties, or an involuntary acquiescence to one party's trade restraining policy." *Id.*

However, a plaintiff cannot survive a Rule 12(b)(6) motion merely by alleging the existence of such an agreement; the plaintiff must also provide "compelling proof that the refusal to deal was motivated by anticompetitive purposes, or [would] produce an anticompetitive effect." *Id.*

Thus, in order to make out a claim under Mass.Gen.L. ch. 93, Remco must allege facts showing 1) that Oreck refused to deal with Remco; 2) that there was an express, implied

or tacit agreement between Remco and Oreck or involuntary acquiescence on Remco's part to Oreck's trade restraining policies; *and* 3) that Oreck's refusal to deal with Remco was for anti-competitive purposes, or produced an anti-competitive effect. Remco has pleaded facts concerning Oreck's refusal to deal with Remco, as well as Remco's involuntary acquiescence to Oreck's trade restraining policies in order to maintain its distributorship relationship.[3] However, Remco has not pled facts to establish the third element of a claim under Mass.Gen.L. ch. 93—that Oreck's refusal to deal with Remco was for anti-competitive purposes or produced an anti-competitive effect.

The primary purpose of antitrust laws is to protect competition, not to protect individual competitors. However, Remco has not pled any facts whatsoever with respect to any potentially anti-competitive effects of Oreck's action. Nor has Remco alleged any facts to support its conclusory allegation that Oreck's refusal to deal was for anti-competitive purposes. In its complaint Remco alleges only that Oreck's actions were "intended to *injure Remco in its business*," not to impede competition *per se*. That is insufficient to state a claim under Mass.Gen.L. ch. 93.

### 4. *Ch. 93A Claim*

■ In Count IV of its complaint, Remco alleges that Oreck engaged in unfair methods of competition and in unfair and deceptive acts and practices, all in violation of Mass.Gen.L. ch. 93A. Ch. 93A does not itself define what constitutes an unfair act or practice, so Massachusetts courts have developed a body of case law which addresses this question.

In *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915 (1975), the Supreme Judicial Court concluded that a practice is unfair if it is immoral, unethical, oppressive, or unscrupulous, or if it would cause substantial injury to consumers, competitors or other businesspeople. *Id.* at 596, 321 N.E.2d 915. The determination of whether a certain business practice is unfair is necessarily a fact-bound one. *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149 (1979).

*PMP Associates* was a "refusal to deal" case. There, the SJC considered whether the Boston Globe's refusal to deal with a potential advertiser (a personal escort service) constituted an unfair practice under ch. 93A. The SJC concluded that it did not, holding that "a refusal to deal, without a showing of monopolistic purpose or concerted effort to hinder free trade, is not an unfair trade practice under G.L. 93A, and is therefore not actionable." *Id.* at 599, 321 N.E.2d 915.

*PMP Associates* is fully applicable to this case. Remco has not alleged any facts from which a fact finder could conclude that Oreck proceeded with a monopolistic purpose or as part of a concerted effort to hinder free trade. Therefore, I conclude that Remco has failed to state a claim under Mass.Gen.L. ch. 93A. *See Ben Elfman & Sons, Inc. v. Criterion Mills, Inc.*, 774 F.Supp. 683, 687 (D.Mass.1991).

### IV.

For the foregoing reasons, I hereby GRANT the defendant's motion to dismiss the complaint.

---

**3.** The non-price restraints which Remco challenges as legally impermissible include Oreck's controls over cooperative advertising and various sales promotions. Within the context of distributorship terminations, courts have afforded manufacturers great latitude to establish certain kinds of non-price restraints, based upon the reasoning that such restraints may have effects that actually enhance competition. *See, e.g., Bruce Drug, Inc. v. Hollister Inc.*, 688 F.2d 853, 860 (1st Cir. 1982); *Winter Hill*, 691 F.Supp. at 545–46 and cases cited therein. Nor do the suggestions in Remco's briefing—but not reflected in its complaint—of complaints by other dealers regarding Remco pricing below minimums assertedly mandated by Oreck establish anti-competitive purpose or effect. *See generally Elfman*, 774 F.Supp. at 685.